680 So.2d 1179 (1996)
Charles A. BROWN d/b/a Triambient Lounge & Restaurant
v.
STATE of Louisiana, Through the DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, LOUISIANA GAMING CONTROL BOARD.
No. 96-CA-2204.
Supreme Court of Louisiana.
October 15, 1996.
Rehearing Denied October 18, 1996.
Opinion Concurring on Denial of Rehearing October 18, 1996.
Opinion Concurring on Denial of Rehearing October 18, 1996.
*1180 Richard P. Ieyoub, Attorney General, Cheney C. Joseph, Jr., Executive Counsel, Jenifer Schaye, Robert B. Barbor, Ann Neeb, Baton Rouge, for Applicant.
Brett Alan Sulzer, Frank D. Blackburn, Baton Rouge, for Respondent.
Basile Joseph Uddo, New Orleans, for A.M.A. Distributors Inc., and Delta Gaming, Inc. (amicus curiae).
Hillar Clement Moore, III, Paul R. Baier, Brett A. Sulzer, Baton Rouge, for SouthWest Louisiana Small Business for Gaming (amicus curiae).
Perry Roger Staub, Jr., Eugene P. Urbanowicz, Jr., Darrell Arthur Clay, Lance Paul Martin, William Patrick Quigley, New Orleans, for ACLU.
Opinion Concurring on Denial of Rehearing by Justice Kimball October 18, 1996.
Opinion Concurring on Denial of Rehearing by Justice Lemmon October 18, 1996.
WATSON, Justice.[1]
This is a direct appeal from the trial court's declaration that R.S. 27:13(C)(6) is unconstitutional insofar as it restricts contributions to committees supporting or opposing issues.

FACTS
Plaintiff, Charles A. Brown d/b/a Triambient Lounge & Restaurant is a video gaming licensee of the Louisiana Gaming Control Board who wishes to contribute to an advertising fund promoting video poker.
The pertinent part of the statute, R.S. 27:13(C)(6) provides:
No member or board employee nor a member of the immediate family of a board member or board employee nor any casino operator or any other licensee or permittee shall make a contribution or loan to, or expenditure on behalf of, a candidate or committee.
Like all legislative enactments, R.S. 27:13(C)(6) enjoys a presumption of constitutionality. Polk v. Edwards, 626 So.2d 1128 (La.1993).
In the definitions section of the statute, the words "candidate" and "committee" are defined according to R.S. 18:1483.
R.S. 18:1483(3)(a) defines a candidate. The word includes any public servant required to file campaign finance reports and anyone whose expenditures or contributions exceed $500.00. The candidate prohibition is not at issue here.
"Committee," R.S. 18:1483(14), means two or more persons organized to support or oppose any candidate, proposition, recall or political party which handles funds in excess of $500.00 within a calendar year. Candidate committees are not an issue here.
After the enactment of R.S. 27:13(C)(6), the Louisiana Gaming Control Board adopted Emergency Rule 107, which provides: "no casino operator, licensee or permittee of the Board shall make a contribution, loan, or expenditure to or on behalf of a candidate or committee."
The trial court decided that R.S. 27:13(C)(6) insofar as it restricts contributions to committees supporting or opposing issues, i.e., independent expenditures not linked to a candidate, is unconstitutional. The trial court issued a preliminary injunction. A suspensive appeal was granted.

LAW
Strict scrutiny applies to any regulation of First Amendment rights. Citizens Against Rent Control v. City of Berkeley, 454 U.S. 290, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981).
The Supreme Court's most recent expression on the First Amendment versus gambling regulation was in Greater New Orleans *1181 Broadcasting Assn. v. U.S., ___ U.S. ___, 117 S.Ct. 39, 136 L.Ed.2d 3 (1996) which vacated a U.S. Fifth Circuit opinion at 69 F.3d 1296 (5th Cir.1995). See Dana M. Shelton, Note, The Fifth Circuit Upholds Federal Ban on Casino Gambling Advertising Against First Amendment Challenge: Greater New Orleans Broadcasting Association v. United States, 70 TUL. L. REV. 1725 (1996). The Fifth Circuit held that the substantial governmental interest served by a federal statute prohibiting casino gambling radio and television advertisements was sufficient to override the First Amendment. Judge Politz stated in dissent:
... protection of commercial speech is not vitiated when the speech concerns lawful but potentially harmful activity, such as alcohol consumption or gambling. 69 F.3d at 1303.
The United States Supreme Court remanded the Greater New Orleans Broadcasting Assn. case for further consideration in light of 44 Liquormart, Inc. v. Rhode Island, 517 U.S. ___, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996).
Liquormart held that Rhode Island's ban on advertising retail liquor prices except at the place of sale violated the First Amendment. Speech prohibitions of this type rarely survive constitutional review. Liquormart states that Posadas de Puerto Rico Associates v. Tourism Co. of P.R., 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986) "clearly erred" in allowing a legislature to suppress casino advertising. Liquormart, ___ U.S. at ___, 116 S.Ct. at 1511-12, 134 L.Ed.2d at 732.
Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), held that the Federal Election Campaign Act's candidate political contribution ceilings did not violate the First Amendment or invidiously discriminate against non-incumbent candidates. They were supported by the substantial government interest in limiting corruption.
First National Bank of Boston v. Bellotti, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), held that a Massachusetts statute, which prohibited certain corporations from making contributions to influence votes, was an unconstitutional abridgement of free speech in violation of the First and Fourteenth Amendments. The question in that case was whether the corporate identity deprived the speech of its otherwise clear entitlement to protection. Justices White, Brennan, and Marshall dissented, stating that the statute properly prohibited corporate management from using corporate monies to promote management's personal views. Justice Rehnquist also dissented on the ground that business corporations, unlike natural persons, have a limited right of political expression.
Citizens Against Rent Control v. City of Berkeley, 454 U.S. 290, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981) dealt with a Berkeley, California ordinance limiting contributions to committees formed to support or oppose ballot measures to $250.00. The California Supreme Court held that the ordinance furthered compelling governmental interests because it insured that special interest groups could not corrupt the initiative process by spending large amounts to support or oppose a ballot measure. The United States Supreme Court reversed, holding that the ordinance's restraints on association and expression contravened the First Amendment. There is no significant state interest in curtailing debate and discussion of ballot measures.

Citizens Against Rent Control states:
Contributions by individuals to support concerted action by a committee advocating a position on a ballot measure is beyond question a very significant form of political expression. As we have noted, regulation of First Amendment rights is always subject to exacting judicial scrutiny. 454 U.S. at 298, 102 S.Ct. at 438, 70 L.Ed.2d at 500.
Whatever may be the state interest or degree of that interest in regulating and limiting contributions to or expenditures of a candidate or a candidate's committees there is no significant state or public interest in curtailing debate and discussion of a ballot measure. Placing limits on contributions which in turn limit expenditures plainly impairs freedom of expression. 454 *1182 U.S. at 299, 102 S.Ct. at 439, 70 L.Ed.2d at 501.
Federal Election Commission v. National Conservative Political Action Committee, 470 U.S. 480, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) held that an expenditures limitation on political committees was constitutionally infirm. Preventing corruption or the appearance of corruption is the only justification for restricting campaign financing. The fact or appearance of corruption is defined as a "financial quid pro quo of dollars for political favors" from a candidate. 470 U.S. 480 at 497, 105 S.Ct. 1459 at 1468-69. There is a fundamental constitutional difference between money spent to advertise views and money contributed to a candidate.
The trial court here relied on Let's Help Florida v. McCrary, 621 F.2d 195 (5th Cir. 1980), aff'd, 454 U.S. 1130, 102 S.Ct. 985, 71 L.Ed.2d 284, cert. denied, 454 U.S. 1142, 102 S.Ct. 999, 71 L.Ed.2d 293 (1982), which held that a Florida statute restricting contributions to political committees organized to urge passage of a casino gambling amendment was unconstitutional. Let's Help Florida points out the distinction between the State's interest in regulating a candidacy election and an issue referendum election. Let's Help Florida holds that:
... the Florida statutes that restrict the size of contributions in a referendum election abridge important first amendment rights and are ill-suited for preventing corruption or for promoting disclosure. 621 F.2d at 201.
Colorado Repub. Campaign Comm. v. FEC, 518 ___ U.S. ___, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) held that Colorado limitations on a political party's expenditures in a U.S. Senate campaign violated the First Amendment. The Colorado case makes explicit the distinction between expenditures coordinated with a candidate and independent expenditures.
The opinion in Colorado has three judges expressing the view that independent expenditures are entitled to First Amendment protection. Four judges concurred in the result but dissented from the candidate exception, stating that regulation of candidate expenditures is not permitted by the First Amendment. Two dissenting justices expressed the view that political party expenditures to secure the election of its candidate ought to be considered candidate contributions. Thus, a clear majority of seven held that limits on independent expenditures violate the First Amendment.
The vast majority of federal and state courts have upheld constitutional challenges to committee contribution restrictions. One New Jersey court of appeal allowed a prohibition against gambling interest contributions.
Soto v. State, 236 N.J.Super. 303, 565 A.2d 1088 (App.Div.1989), U.S. cert. denied, 496 U.S. 937, 110 S.Ct. 3216, 110 L.Ed.2d 664 (1990), dealt with a New Jersey statute prohibiting casino officers or key employees from contributing to candidates or groups organized to support candidates. Soto states: "Gambling is an activity rife with evil.... it is the pronounced policy of the State to regulate and control the casino industry with the utmost strictness to the end that public confidence and trust in the honesty and integrity of the State's regulatory machinery can be sustained." 565 A.2d at 1094. The Soto plaintiff argued that she was being denied equal protection because the prohibition did not extend to those in the liquor and horse racing businesses. The argument was rejected on the ground that casino gambling is a unique activity.
Soto is the only case supporting the State of Louisiana's position in support of the legislation. However, the New Jersey statute prohibited casino contributions to candidates or groups organized to support candidates. Here we are dealing with contributions to promote a point of view, a decided difference. Colorado, supra. Regardless of Soto`s merits, its rationale does not apply here.

CONCLUSION
The expenditures prohibited by the Louisiana statute are clearly independent expenditures, not candidate coordinated, and are entitled to the broadest First Amendment protection. Individuals, candidates, political committees and political parties have a constitutional right to make unlimited independent *1183 expenditures. Citizens Against Rent Control, supra; Federal Election Comm'n, supra; Colorado, supra.
When a matter is submitted to the public for a vote, it is essential that the public has a free flow of information. Greater New Orleans Broadcasting Assn., supra. The fact that many consider gambling and liquor vices does not justify the suppression of differing views. There is no vice exception to the right of free speech. Liquormart, supra, ___ U.S. at ___, 116 S.Ct. at 1513, 134 L.Ed.2d at 734. Contributions to committees advocating a point of view cannot be restricted without violating the First Amendment. Citizens Against Rent Control, supra.
The State's interest in limiting contributions to candidates and candidates' political committees does not justify limiting contributions to committees supporting or opposing ballot measures. First National Bank of Boston, supra. The corruption rationale only applies to candidate or candidate committee limitations. Citizens Against Rent Control, supra.
Gambling activity is strictly regulated and may be suppressed. However, the State may not ban commercial speech simply because the State may constitutionally prohibit the underlying conduct. Liquormart, supra, ___ U.S. at ___, 116 S.Ct. at 1512-13, 134 L.Ed.2d at 733.
The First Amendment clearly prohibits suppression of information. Communicating ideas requires the expenditure of money, and Louisiana may not restrict contributions to political committees organized to communicate ideas.

DECREE
R.S. 27:13(C)(6) is clearly unconstitutional under the First Amendment to the U.S. Constitution insofar as it prohibits contributions to committees supporting or opposing ballot measures. The equal protection question is pretermitted. The trial court correctly found the law unconstitutional in part and granted a preliminary injunction. The trial court judgment is affirmed. The State of Louisiana and the Louisiana Gaming Control Board are enjoined against enforcing R.S. 27:13(C)(6) and Emergency Rule 107 insofar as they prohibit contributions, expenditures and loans to independent committees unconnected with candidates. Any rehearing applications must be filed within forty-eight hours of rendition of this opinion, which is handed down at 2:35 p.m., October 15, 1996.
AFFIRMED. INJUNCTION ISSUED. REHEARING DELAY LIMITED TO FORTY-EIGHT HOURS.
BLEICH, J., dissents and assigns reasons.
BLEICH, Justice, dissenting.
This case is not factually ripe for decision. A matter of this importance should be decided only after a full trial on the merits, not a scant hearing for a preliminary injunction. With the deepest respect to the majority and persuaded that the plaintiff possesses a compelling legal argument, I believe that the majority decides this matter too hastily. Without receiving evidence, the trial court has held, and the majority of this court has affirmed, that the LSA-R.S. 27:13 C(6) restriction on political contributions to political action committees[1] by gambling interests is an unconstitutional infringement of these persons' First Amendment rights. The protection of First Amendment rights is of paramount importance. However, this decision should not be made without a complete record before this court. I would therefore remand this matter to the trial court for a full evidentiary hearing.
The First Amendment operates to protect both political expression and political association. Buckley v. Valeo, 424 U.S. 1, 15, 96 S.Ct. 612, 632-33, 46 L.Ed.2d 659 (1976). However, this constitutional interest may be impeded if the state has a sufficiently compelling countervailing interest, and the stricture is narrowly tailored to meet the concern. Id. at 25, 96 S.Ct. at 637-38; NAACP v. *1184 Alabama, 357 U.S. 449, 463, 78 S.Ct. 1163, 1172, 2 L.Ed.2d 1488 (1958).
I would allow the State to introduce evidence to demonstrate that limiting the political influence of gambling interests in the State of Louisiana is a sufficiently compelling interest to justify this statutory ban. The State would also have to demonstrate that the statute at issue is narrowly tailored to accomplish its goals of preventing corruption and the appearance of impropriety in the gambling industry.
Gambling was legalized in this state only after earnest and sustained debate by the legislature.[2] Citizens voiced apprehensions concerning increased crime, poverty, and government corruption, and expressed fears regarding the adverse impact of legalized gambling upon families and communities. Gambling was finally approved only after assurances of stringent regulation of the industry by government. LSA-R.S. 27:2(A).
The State argues that the Act at issue serves the interest of preventing the large sums of money accessible to gambling interests from overwhelming the marketplace of ideas in their favor, to an extent that competing interests are unable to match. This statute would, according to the state, serve the interest not only of preventing gambling interests from attaining unwarranted political voice and clout, it would also help avoid the appearance of corruption in the industry. The State should be given the opportunity to present evidence to support these positions.
Given Louisiana's history of corruption in the gambling industry,[3] and the problems *1185 already mounting in the industry, particularly concerning video poker gambling, this issue is of prime concern as the legislature works to keep its promise to the people of controlling gambling and keeping it clean.
The only restriction drawn by the Act is the prevention of payments to Political Action Committees by owners of gaming establishments. However, the state has not been allowed to show that this is the least restrictive alternative via an evidentiary hearing. At such trial, the plaintiffs could also attempt to introduce evidence that the statute is too broadly drawn to effect only its limited purpose.
The theories and positions of the respective parties should be fully developed and then considered only after a full trial on the merits allowing all parties to present any admissible evidence. Parenthetically, it is noted by counsel for Amici Curiae that "there is no evidence in the record supporting the State's absolute ban on contributions aimed at promoting video poker ..."[4] The reason for this lack of evidence stems perhaps from the fact that the decision made by the lower court was in the context of a preliminary injunction and not a permanent injunction. Counsel for Southwest is correct in stating that this court is "never told how outlawing industry contributions to media PACs favoring retention of video poker will corrupt the democratic process." Precisely this and the entire record compels a call for a complete presentation of evidence. What has led this court to this procedural and time-constraint posture is of no moment now.
This decision should not be made in a rush to judgment to answer questions simply because of an election. The issues involved before this court are far too important to be decided hastily.[5] Elections may come and go, referenda may be submitted, debated and decided. Important issues such as these before us involving free speech and the legitimate interests of the state should be decided only after a full review of not just the law but also a complete record.
Being of the opinion that this case is premature for decision, and that all parties should be required to present their cases before the lower court, which record can then be reviewed, I have unsuccessfully argued to the majority that their decision today is premature.
I respectfully dissent.
KIMBALL, Justice, additionally concurring in denial of rehearing.
In my view, plaintiffs herein have made a successful facial attack on the constitutionality of LSA-R.S. 27:13(C)(6). I believe the United States Supreme Court has made it abundantly clear that there is no state interest in depriving any citizen from exercising his or her First Amendment rights to promote ballot measures.
The Louisiana Constitution gives this court appellate jurisdiction to determine the constitutionality vel non of a statute or ordinance that has been declared unconstitutional by a lower court, whatever the procedure, which we have properly done in this case. La. Const. art. 5, § 5(D); see, e.g., Louisiana Republican Party v. Foster, 96-0314 (La. 5/21/96), 674 So.2d 225; City of Baton Rouge v. Ross, 94-0695 (La. 4/28/95), 654 So.2d 1311, 1325 (Calogero, C.J., concurring). Plaintiffs herein have successfully brought a facial challenge to the constitutionality of LSA-R.S. 27:13(C)(6). That statute, insofar as it restricts the ability of certain citizens to engage in the political process by voicing their opinions on a ballot measure, undercuts the very essence of the right of free speech secured by the First Amendment. There is, therefore, no valid reason to require these parties to engage in a useless hearing to *1186 allow the State an opportunity to prove that which cannot, as a matter of constitutional law, be proven. As the United States Supreme Court has clearly stated, "there is no significant state or public interest in curtailing debate or discussion of a ballot measure." Citizens Against Rent Control v. City of Berkeley, 454 U.S. 290, 299, 102 S.Ct. 434, 439, 70 L.Ed.2d 492, 501 (1981).
LEMMON, Justice, additionally concurring in denial of rehearing.
The State is correct that the trial court, at this stage of this action for declaratory judgment and ancillary injunctive relief, only should have granted a preliminary injunction upon plaintiffs' showing of the likelihood of success on the merits. Nevertheless, I vote to deny the rehearing application because the State has not asserted in this proceeding a compelling governmental interest in protecting corruption of the electorate that would justify La. Rev. Stat. 27:13(C)(6)'s limitation on contributions to committees formed to favor or oppose ballot measures. Accordingly, evidence regarding these asserted interests at the trial on the merits of the final injunction or the declaratory judgment would be of no avail.
NOTES
[1] Victory, J., not on panel. Rule IV, § 3.
[1] Not at issue this date is the question of the validity of contributions to candidates. Since that issue will probably be ultimately presented to this court, this writer finds it yet more imperative that a fully developed record be presented.
[2] This writer would also note that this debate has been perpetuated by this court's erroneous decision in Polk v. Edwards, 626 So.2d 1128 (La. 1993). However, the validity of Polk is not before us today.
[3] This writer takes notice of a mere sampling of news articles and excerpts therefrom:

T.J. Simoneaux, "First Lottery in La. Led to National BanLSU Professor Examines Similarities, Differences," The Baton Rouge Advocate, Jan. 9, 1986, at 1A:
Gov. Edwin Edwards' proposal for a state lottery to ease Louisiana's financial crunch naturally has resurrected memories of the state's initial stab at a large-scale game of chance: the 1868-1893 Louisiana State Lottery Co.
That lotterya corrupt enterprise approved by bribed legislators and run by two New York "carpetbaggers"garnered millions for a few people, but almost nothing for Louisiana, whose severe economic problems then paralleled the state's situation today, an LSU history professor says.
* * *
The Louisiana State Lottery Co. continued to bribe legislators to keep its franchise and paid off state newspaper editors to ensure a good public image, Carleton says. But officials and newspapers in other state began to publicize allegations about the "Golden Octopus," as the lottery's detractors called it in reference to the way it "stretched into every area of the nation," Robbins wrote in the Smithsonian. By 1879, anti-lottery forces here were strong enough to have the Legislature take away the company's charter.
T.J. Simoneaux, "Gambling is as Common as Crawfish to Louisiana," The Baton Rouge Advocate, Jan. 8, 1986, at 1A: As early as the colony's founding in 1699, Louisiana officials reported trouble in trying to stop games of chance. Gambling was legalized in 1823 and New Orleans soon had 14 casinos, which offered such games as faro, roulette and 21. However, pressure from religious and other community groups ended legalized gambling in 1836.
* * *
In Baton Rouge, the election of new officials spurred a parish grand jury investigation that resulted in widespread indictments in 1948 for violation of gambling laws.
Elizabeth Mullener, "The Once and Future Gambling Town," New Orleans Times Picayune, June 14, 1992, at A1:
From the early 18th century, New Orleans has been a hotbed of gambling activity. Since the first settlers played games of chance in ale houses and taverns, the city has lived up to its reputation as an easy place to find trouble, tolerant of free spirits and free spending alike.
At times gambling has been legal; at times it has been illegal; at times it has been somewhere in between. Games are sometimes wide open and sometimes strictly underground. But always, through even the most stringent efforts at reform, gambling has endured.
And always it has attracted liberal doses of the vices that traditionally go along with it prostitution, crime and most of all, corruption. Marsha Shuler, "State's Last Lottery Booted
by 40-1 Margin," The Baton Rouge Advocate, Jan. 9, 1986, at 7B:
The last time Louisiana voters had a lottery proposition on the ballot they voted it down by a 40-1 margin.
That was in March 1892 when voters shut down the now legendary Louisiana Lottery.
* * *
The U.S. Congress stepped into the picture, barring from the mails all letters, newspapers and circulars with information about the lottery.
The action came at the urging of President Benjamin Harrison who said: "The people of all states are debauched and defrauded ... by the Louisiana Lottery."
See also, Charles Hunt, "Riverboats and RacetracksIn 19th Century, Louisiana Had Games for All Tastes," The Baton Rouge Sunday Advocate, Sept. 4, 1994, at 18 Magazine.
[4] Brief of Amici Curiae Southwest Louisiana Small Businesses for Video Gaming, et al., In Support of Appellee Charles A. Brown, p. 1.
[5] The referendum election date is Nov. 5, 1996.

Counsel for all parties have stressed an urgency for a speedy decision.